■ In the Matter of STEVEN M. TAMES, Petitioner, v BARBARA A. DEBUONO, as Commissioner of Health of the State of New York, et al., Respondents. [683 NYS2d 665] —Cardona, P. J. Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Public Health Law § 230-c [5]) to review a determination of the Hearing Committee of the State Board of Professional Medical Conduct which revoked petitioner's license to practice medicine in New York.

Since obtaining his medical license in August 1979, petitioner has practiced in the specialty of pediatric and adolescent medicine. In June 1996, the Bureau of Professional Medical Conduct (hereinafter BPMC) filed a statement of charges against petitioner concerning his treatment of three adolescent male patients (hereinafter patients A, B and C). The statement alleged, *inter alia*, that petitioner had inappropriate sexual contact with the patients. Petitioner was formally charged in nine separate specifications with committing professional misconduct by willfully harassing, abusing or intimidating a patient either physically or verbally (Education Law § 6530 [31]), engaging in conduct that evidences moral unfitness to practice medicine (Education Law § 6530 [20]) and practicing the profession of medicine fraudulently (Education Law § 6530 [2]). Following a hearing, a three-person Hearing Committee of the State Board for Professional Medical Conduct (hereinafter the Hearing Committee) found petitioner guilty of the charges and revoked his license, resulting in this CPLR article 78 proceeding challenging the determination.

The scope of our review entails ascertaining whether the Hearing Committee's determination is supported by substantial evidence (*see, Matter of Gross v DeBuono,* 223 AD2d 789; *Matter of Adler v Bureau of Professional Med. Conduct,* 211 AD2d 990). Patient A testified that he was treated by petitioner for Marfan's Syndrome from February 1995 through November 1995 and, after his first appointment, petitioner requested that patient A's mother leave the examining room. Patient A stated that during many of the examinations petitioner touched his genitalia. He indicated that, during an examination on November 7, 1995, petitioner instructed him to masturbate and assisted him by rubbing his penis until he ejaculated. Patient A's mother confirmed that petitioner asked her to leave the room and stated that, after the November 7, 1995 appointment, her son informed her that petitioner instructed him to masturbate and assisted him in doing so.

Patient B has diabetes and treated with petitioner in 1986 and again in 1990 through 1991. Although patient B did not testify at the hearing, his mother appeared and gave testimony concerning petitioner's treatment of her son. She stated that, when patient B was hospitalized in 1986, petitioner removed him from his room and, when he returned, he was agitated and told her "I don't want to be with this faggot". Patient B's mother further reported that her son indicated that petitioner had touched his groin without wearing gloves and asked him to cough, making him feel "very strange". When she asked petitioner why he was examining her son's genital area, he told her it was to check for neurological damage. Additionally, she testified that her son told her that petitioner, during a visit in January 1991, directed him to ejaculate into a cup while imagining being on a beach with pretty girls. Patient B told her that, during a second visit in January 1991, petitioner again instructed him to masturbate.

Patient C was afflicted with Short-Gut Syndrome and began treating with petitioner when he was 12 years old. He testified that, when he turned 14 years of age, petitioner told him to masturbate and would assist him without wearing gloves. Patient C stated that petitioner explained that he needed to check his sperm count and growth. He indicated that, when petitioner instructed him to masturbate, he told him to imagine pretty girls on an island. Patient C further testified that, on one occasion after he had ejaculated, he felt petitioner stick an instrument into his penis. There was proof by patient C that petitioner would drive him home from his appointments which were scheduled late in the afternoon. Patient C's mother averred that her son told her that petitioner made him ejaculate into a cup. She stated that when questioning petitioner, he explained this was necessary because he needed to obtain a sperm count.

Alfred Markowitz, a physican employed by the BPMC, testified that there was no therapeutic need for a physican treating an adolescent patient afflicted with Marfan's Syndrome, Short-Gut Syndrome or diabetes to require the patient to masturbate during an examination. Markowitz stated that patient C's medical records did not reveal that tests were conducted to ascertain his sperm count.

Petitioner denied assisting or requesting any of the patients to masturbate. He stated, however, that he did conduct routine genital examinations of each patient. He further testified that patient A attained an erection during the course of one examination and spontaneously ejaculated when petitioner touched

his scrotum. Petitioner admitted that he did not note this in patient A's medical record. Petitioner stated that he conducted a genital examination of patient B on two occasions in response to his complaints of pain and irritation. With respect to patient C, he indicated that he conducted routine genital examinations once a year and checked patient C for gonorrhea on one visit, which entailed inserting a metal rod into his penis. Petitioner alleged various circumstances motivating each of the witnesses to testify against him. In addition, other doctors and former patients were produced on his behalf.

Resolution of this case turns upon the evaluation of the credibility of the various witnesses. Credibility issues and the weight to be accorded certain evidence are matters exclusively within the province of the Hearing Committee (*see, Matter of Gross v DeBuono*, 223 AD2d 789, 790, *supra*; *Matter of Adler v Bureau of Professional Med. Conduct*, 211 AD2d 990, 991, *supra*; *Matter of Briggs v Board of Regents*, 188 AD2d 836, 838, *lv denied* 81 NY2d 708), which was free to credit the testimony of those witnesses produced by the BPMC over the testimony of petitioner and his witnesses. Inasmuch as the Hearing Committee's findings should be given deference in this regard, we conclude that substantial evidence supports the determination of guilt with respect to the charges (*see, Matter of Coderre v DeBuono*, 247 AD2d 793; *Matter of Gross v DeBuono, supra*).

Moreover, we reject petitioner's contention that the penalty of revocation of his medical license is excessive under the circumstances presented. Such a penalty has not been found to be "so incommensurate with the offense as to shock one's sense of fairness" (*Matter of Adler v Bureau of Professional Med. Conduct, supra*, at 993; *see, Matter of Pell v Board of Educ.*, 34 NY2d 222, 233; *Matter of Lombardo v DeBuono*, 233 AD2d 789, 793; *Matter of De Paula v Sobol*, 191 AD2d 822, 825) where, as here, a physician has engaged in inappropriate sexual contact with his patients (*see, e.g., Matter of Morrison v DeBuono*, 255 AD2d 710; *Matter of Berges v Chassin*, 216 AD2d 698; *Matter of Finelli v Chassin*, 206 AD2d 717; *Matter of Briggs v Board of Regents*, 188 AD2d 836, *supra*). Furthermore, we find no merit to petitioner's assertion that the chairperson of the Hearing Committee was unduly biased and, in any event, note that petitioner has failed to demonstrate that the outcome of the hearing flowed from the alleged bias (*see, Matter of Coderre v DeBuono, supra*, at 795; *Matter of Kabnick v Chassin*, 223 AD2d 935, 936, *affd* 89 NY2d 828). We have considered petitioner's remaining arguments and find them to be unpersuasive.

Crew III, Yesawich Jr., Peters and Carpinello, JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.